# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-06-00503-CV
---

The State of Texas, appearing by and through the Office of the Attorney General, Consumer Protection and Public Health Division, Public Agency Representation Section; Cities of Dickinson, Friendswood, La Marque, League City, Lewisville and Texas City; Texas-New Mexico Power Company; First Choice Power, Inc.; and Texas Generating Co., L.P., Appellants

v.

Public Utility Commission of Texas, represented by the Office of the Attorney General, Natural Resources Division; and Texas Industrial Energy Consumers, Appellees

---
**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-GN-05-003499, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**
---

## O P I N I O N

This appeal arises from the district court's judgment affirming the final order of the Public Utility Commission in the true-up proceeding to finalize "stranded costs" for Texas-New Mexico Power Company, First Choice Power, Inc., and Texas Generating Company, L.P. (collectively "TNMP") under section 39.262 of the Public Utility Regulatory Act ("PURA")[1] and PUC Substantive Rule 25.263. Because we conclude the Commission's final order was consistent with the plain language of the relevant statutes and was supported by substantial evidence, we affirm the judgment of the district court affirming the Commission's final order.

---

[1] Tex. Util. Code Ann. §§ 11.001-64.158 (West 2007).

**FACTUAL AND PROCEDURAL BACKGROUND**

In 1999, the legislature enacted Senate Bill 7 ("SB 7"), which amended the PURA to restructure and partially deregulate the Texas retail electric power industry. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543; *see also CenterPoint Energy Houston Electric, LLC v. Gulf Coast Coalition of Cities*, No. 03-05-00557-CV, 2007 Tex. App. LEXIS 9919, at *3-*18 (Tex. App.—Austin Dec. 20, 2007, no pet. h.) (describing statutory framework for transition to competitive retail electric market) (hereafter "*CenterPoint*"). As part of the transition from regulation to retail competition, the legislature authorized each electric utility to recover "all of its net, verifiable, nonmitigable stranded costs incurred in purchasing power and providing electric generation service." Tex. Util. Code Ann. § 39.252(a) (West 2007). The term "stranded costs" is defined in section 39.251 of the PURA[2] but, generally speaking, stranded costs represent prudently incurred expenditures made by the utilities in a regulated environment—previously recoverable over time through regulated rates paid by consumers—that have become unrecoverable in a competitive

---

[2] Section 39.251(7) defines the term "stranded costs" as:

the positive excess of the net book value of generation assets over the market value of the assets, taking into account all of the electric utility's generation assets, any above market purchased power costs, and any deferred debit related to a utility's discontinuance of the application of Statement of Financial Accounting Standards No. 71 ("Accounting for the Effects of Certain Types of Regulation") for generation-related assets if required by the provisions of this chapter. For purposes of Section 39.262, book value shall be established as of December 31, 2001, or the date a market value is established through a market valuation method under Section 39.262(h), whichever is earlier, and shall include stranded costs incurred under Section 39.263.

*Id.* § 39.251(7).

market. *See Reliant Energy, Inc. v. Public Util. Comm'n*, 101 S.W.3d 129, 132 (Tex. App.—Austin 2003), *rev'd on other grounds*, *CenterPoint Energy, Inc. v. Public Util. Comm'n*, 143 S.W.3d 81 (Tex. 2004) (op. on reh'g). Recovery of stranded costs is one of the final steps in the transition from traditional cost-of-service regulation to retail competition.

TNMP filed an application with the Commission seeking to recover $266,487,442 in total stranded costs. TNMP also sought recovery of $106,573,973 for the capacity auction true-up. *See* Tex. Util. Code Ann. §§ 39.153, .262(d) (West 2007). As a preliminary matter, the Commission determined that TNMP was not entitled to a capacity auction true-up as a matter of law. *See id.* § 39.153; PUC Subst. R. 25.381(d).[3] Thereafter, the Commission referred TNMP's application to the State Office of Administrative Hearings for a contested case hearing.

After conducting a hearing and reviewing the evidence submitted by the parties, the administrative law judges issued a proposal for decision on May 28, 2004, including findings of fact and conclusions of law. The Commission adopted the PFD in part and modified the ALJs' findings with respect to the following issues: 1) whether the sale of TNP One—TNMP's sole generating plant—was a bona fide, third-party transaction under a competitive offering;[4] 2) whether TNMP pursued commercially reasonable efforts to mitigate stranded costs; 3) the gross-up of stranded-cost disallowances; and 4) the interest rate for calculating carrying costs on TNMP's final fuel balance.

---

[3] *See also* Supplemental Preliminary Order, PUC Docket No. 29206 (Public Util. Comm'n Mar. 3, 2004), *available at* http://interchange.puc.state.tx.us/WebApp/Interchange/Documents/ 29206_156_429330.PDF.

[4] TNMP sold TNP One to Twin Oaks Power, LLP, an affiliate of Sempra Energy Resources.

3

The Commission rejected the ALJs' recommendation and determined that TNMP's sale of its TNP One generating plant was not a bona fide, third-party transaction under a competitive offering within the meaning of section 39.262(h) of the PURA. The Commission concluded that TNMP failed to comply with section 39.262(h) and failed to carry its burden of proving the market value of TNP One. Based on the evidence in the record, the Commission determined that the market value of TNP One was $180 million. The Commission used this market value to determine what it referred to as TNMP's *primary* stranded cost balance.

Alternatively, the Commission found that, even if it accepted the ALJs' recommendation that TNMP's sale of TNP One was a bona fide, third-party transaction under a competitive offering within the meaning of section 39.262(h), TNMP failed to use commercially reasonable means to mitigate its stranded costs as required under section 39.252(d). Under this alternative finding, the Commission adopted the ALJs' proposed market valuation of TNP One and the ALJs' proposed adjustments, with modifications, to TNMP's book value to reflect the lack of commercial reasonableness. Using this approach, the Commission determined what it referred to as TNMP's *alternative* stranded cost balance.

Less than two months after the Commission rendered its final order, the Texas Supreme Court issued its opinion in *CenterPoint Energy, Inc. v. Public Utility Commission*, 143 S.W.3d 81 (Tex. 2004) (hereafter "*CenterPoint Energy*"). In its opinion, the supreme court held that interest on stranded costs must accrue from January 1, 2002, not from the date of the utility's final true-up case as provided in PUC Substantive Rule 25.263(l)(3). *Id.* at 84. Accordingly, the

4

Commission granted rehearing and remanded the case to SOAH for the ALJs to recalculate and quantify the interest due TNMP in light of the supreme court's opinion.

The ALJs issued a Remand PFD on March 11, 2005, and recommended interest in the amount of $41,736,027 on the Commission's primary stranded cost balance and $45,304,441 on the Commission's alternative stranded cost balance. In its final order, entitled "Second Order on Rehearing," the Commission adopted the Remand PFD in part, modified the ALJs' findings with respect to the appropriate interest rate to be applied to TNMP's stranded cost balance, and recalculated the total interest due TNMP.

After recalculating the interest amount due, the Commission approved a *primary* stranded cost balance of $128,820,365. This amount was further offset by TNMP's final fuel balance of $41,504,474 and carrying costs on the additional TNP One depreciation, plus interest due on stranded costs of $39,166,214. The net amount of stranded cost recovery authorized by the Commission was $110,603,855.[5]

Several parties sought judicial review in the Travis County District Court of the Commission's Second Order on Rehearing as permitted under section 2001.171 of the Administrative Procedure Act. *See* Tex. Gov't Code Ann. § 2001.171 (West 2000). The district court consolidated all of these appeals into one proceeding and rendered judgment affirming the

---

[5] Based on its finding that TNMP failed to take commercially reasonable steps to mitigate stranded costs, the Commission approved an *alternative* stranded cost balance of $139,834,457. Like the primary stranded cost balance, this amount was further offset by TNMP's final fuel balance of $41,504,474 and carrying costs on the additional TNP One depreciation, plus interest due on stranded costs of $42,514,910. The net amount of stranded cost recovery authorized by the Commission under this alternative approach was $124,966,643.

5

Commission's order in all respects on July 24, 2006. TNMP, as well as the Cities of Dickinson, Friendswood, La Marque, League City, and Lewisville (collectively "Cities"), and the State of Texas, on behalf of all state entities and institutions that are electricity consumers ("State Agencies"), appeal from the district court's judgment.

## DISCUSSION

On appeal, the parties raise various issues challenging the Commission's final order. The Cities and State Agencies argue that the Commission erred in determining the market value of TNMP's assets when TNMP failed to carry its burden of proof on this issue.[6] In two additional issues, the Cities argue that the Commission erred in failing to effectuate TNMP's prior agreement to reduce stranded costs and in calculating the interest owed on TNMP's final true-up balance. For its part, TNMP raises three issues on appeal, arguing that the Commission erred in denying TNMP's capacity auction true-up, in "grossing up" disallowances for alleged federal income tax benefits, and in reducing the net book value of TNMP's assets for investment tax credits. The Commission responds that there was no error in its final order and the order was supported by substantial evidence.

### *Standard of Review*

In their challenges to the Commission's final order, the parties have raised a variety of issues, which we review under different standards of review. We briefly summarize these

---

[6] The Texas Industrial Energy Consumers (TIEC) support the Cities and State Agencies in this issue, but TIEC did not file a separate appeal.

different standards. As a general matter, we review the Commission's final order under the substantial evidence rule. *See* Tex. Util. Code Ann. § 15.001 (West 2007); Tex. Gov't Code Ann. § 2001.174 (West 2000). Under the substantial evidence rule, we give significant deference to the agency in its field of expertise. *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995); *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984). We presume that the agency's order is valid and that its findings, inferences, conclusions, and decisions are supported by substantial evidence. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *Charter Med.*, 665 S.W.2d at 452. The complaining party has the burden to overcome this presumption. *City of El Paso*, 883 S.W.2d at 185; *Hammack v. Public Util. Comm'n*, 131 S.W.3d 713, 725 (Tex. App.—Austin 2004, pet. denied). In conducting a substantial evidence review, we evaluate the entire record to determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988); *Suburban Util. Corp. v. Public Util. Comm'n*, 652 S.W.2d 358, 364 (Tex. 1983). We may not substitute our judgment for that of the agency on the weight of the evidence on questions committed to the agency's discretion. Tex. Gov't Code Ann. § 2001.174; *Charter Med.*, 665 S.W.2d at 452; *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied).

Under a substantial evidence review, the issue for the reviewing court is not whether the agency's decision was correct, but whether the record demonstrates some reasonable basis for the agency's action. *Charter Med.*, 665 S.W.2d at 452; *Central Power & Light Co. v. Public Util.*

7

*Comm'n*, 36 S.W.3d 547, 561 (Tex. App.—Austin 2000, pet. denied). The evidence in the record may preponderate against the decision of the agency and nevertheless amount to substantial evidence. *Charter Med.*, 665 S.W.2d at 452; *Meier Infinity v. Motor Vehicle Bd.*, 918 S.W.2d 95, 98 (Tex. App.—Austin 1996, writ denied). We will sustain the agency's order if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *Charter Medical*, 665 S.W.2d at 453; *Suburban Util. Corp.*, 652 S.W.2d at 364. We will reverse the agency's order if the decision is not reasonably supported by substantial evidence, in violation of a constitutional or statutory provision, in excess of the agency's statutory authority, made through unlawful procedure, affected by other error of law, arbitrary or capricious, or characterized by an abuse of discretion. *See* Tex. Gov't Code Ann. § 2001.174(2)(A)-(F).

Several issues raised by the parties involve questions of statutory construction, which we review *de novo*. When construing a statute, our primary goal is to determine and give effect to the legislature's intent. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). To determine legislative intent, we look to the statute as a whole, as opposed to isolated provisions. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We begin with the plain language of the statute at issue and apply its common meaning. *City of San Antonio*, 111 S.W.3d at 25. Where the statutory text is unambiguous, we adopt a construction supported by the statute's plain language, unless that construction would lead to an absurd result. *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999). We give serious consideration to an agency's interpretation of the statutes it is charged with enforcing, so long as that interpretation is reasonable and consistent with the statutory language. *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993); *Steering Comms.*

*for the Cities Served by TXU Elec. v. PUC*, 42 S.W.3d 296, 300 (Tex. App.—Austin 2001, no pet.). This is particularly true when the statute involves a complex subject matter. *Steering Comms. for Cities*, 42 S.W.3d at 300. Courts, however, "do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise, or deal with a nontechnical question of law." *Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.).

Additionally, several issues raised by the parties challenge the Commission's authority. The Public Utility Commission "is a creature of the Legislature and has no inherent authority." *Public Util. Comm'n v. GTE-SW Corp.*, 901 S.W.2d 401, 407 (Tex. 1995). Like other state administrative agencies, the Commission "has only those powers that the Legislature expressly confers upon it" and "any implied powers that are necessary to carry out the express responsibilities given to it by the Legislature." *Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 316 (Tex. 2001). It is not enough that the power claimed by the Commission be reasonably useful to the Commission in discharging its duties; the power must be either expressly conferred or necessarily implied by statute. The agency may not "exercise what is effectively a new power, or a power contradictory to the statute, on the theory that such a power is expedient for administrative purposes." *Id.*

### The statutory scheme

Before addressing the issues raised by the parties, we provide a brief overview of the statutory scheme allowing for recovery of stranded costs. *See also CenterPoint*, 2007 Tex. App. LEXIS 9919, at *3-*18 (for discussion of statutory framework). In 1999, the legislature determined

9

it was in the public interest to partially deregulate the electric power industry. *See generally* Tex. Util. Code Ann. §§ 39.001-.910 (West 2007). When the legislature mandated the transition from traditional cost-of-service regulation to retail competition, it recognized that many utility companies had made very large investments to build power generation plants and that while the costs of these power plants might be recoverable from ratepayers in a regulated environment, these same costs "might well become uneconomic and thus unrecoverable in a competitive, deregulated power market." *CenterPoint Energy*, 143 S.W.3d at 82; *see also City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231, 237-38 (Tex. 2001). The legislature called these uneconomic assets "stranded costs." *CenterPoint Energy*, 143 S.W.3d at 82; *see also* Tex. Util. Code Ann. §§ 39.001(b)(2), .251(7). As part of the transition to retail competition, the legislature made an express finding that it was in the public interest to allow utility companies to recover their stranded costs. *See* Tex. Util. Code Ann. § 39.001(b)(2). The legislature thus "set forth a comprehensive scheme for estimating, finalizing, and recovering those costs." *CenterPoint Energy*, 143 S.W.3d at 83; *see* Tex. Util. Code Ann. §§ 39.201, .251-.254, .256-.265, .301-.313 (West 2007).

The legislature provided a mechanism in section 39.262 of the PURA for each utility to recover its stranded costs. *See* Tex. Util. Code Ann. § 39.262. This mechanism requires each transmission and distribution utility, its affiliated retail electric provider, and its affiliated power generation company to jointly file an application with the Commission to finalize stranded costs.[7]

---

[7] As part of the transition to retail competition, each existing utility was required to "unbundle" the services it provided and separate its business activities into three distinct units: a power generation company, a transmission and distribution utility, and a retail electric provider. Tex. Util. Code Ann. § 39.051; *see City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231, 237 (Tex. 2001).

*Id.* § 39.262(c). The legislature provided a formula to calculate the utility's stranded costs. *Id.* § 39.251(7). Under this formula, a utility's stranded costs equal the excess amount of the net book value of generation assets minus the market value of those assets—*i.e.*, SC = NBV – MV. *Id.*

Each utility has the burden of quantifying its stranded costs using one of four statutory methods. *Id.* § 39.262(h). These methods are sale-of-assets, stock valuation, partial stock valuation, or exchange of assets. *Id.* § 39.262(h)(1)-(4). TNMP chose to establish its stranded costs using the sale-of-assets method. Under this method, TNMP was required to demonstrate that it sold its generating assets in a "bona fide third-party transaction under a competitive offering." *Id.* § 39.262(h)(1). Once this showing has been made, the total net value realized from the sale will establish the market value of the generation assets sold. *Id.*

The legislature recognized, however, that during the transition from regulation to retail competition, utilities would not have a business incentive to reduce their potential stranded costs. Accordingly, the legislature provided a statutory incentive—the legislature required each utility to "pursue commercially reasonable means to reduce its potential stranded costs, including good faith attempts to renegotiate above-cost fuel and purchased power contracts or the exercise of normal business practices to protect the value of its assets." *Id.* § 39.252(d). The legislature also required the Commission to consider each utility's efforts to mitigate potential stranded costs when determining the utility's final stranded cost balance. *Id.* In addition, the legislature required the Commission to ensure that each utility does not overrecover stranded costs. *Id.* § 39.262(a); *see also CenterPoint Energy*, 143 S.W.3d at 98-99. With this statutory scheme in mind, we turn to the parties' complaints regarding the Commission's determination of TNMP's stranded costs.

11

***The Commission's determination of TNMP's stranded costs***

Through various issues asserted on appeal, the parties raise two general challenges to the Commission's final order. First, the Cities and State Agencies attack the Commission's determinations regarding the market value of TNMP's generation assets. Second, the Cities and TNMP challenge certain calculations and adjustments to the book value of TNMP's generation assets. In addition to these general challenges, the Cities argue that the Commission erred in its calculation of interest on TNMP's stranded cost balance. TNMP also complains that the Commission erroneously denied its capacity auction true-up and that the Commission erred in "grossing up" disallowances to capture alleged federal income tax benefits.

### 1. *Market value of TNMP's generation assets*

We turn first to the Cities' and State Agencies' arguments that the Commission erred in awarding stranded costs to TNMP because TNMP failed to prove the market value of TNP One. Specifically, the Cities and State Agencies argue that the Commission erred in devising its own valuation method to quantify TNMP's stranded costs. The State Agencies further argue that because TNMP failed to prove the market value of TNP One in a "bona fide third-party transaction under a competitive offering" as required under section 39.262(h)(1) of the PURA, the Commission was not permitted to devise an extra-statutory method of stranded cost recovery and, in doing so, the Commission violated the parties' due process rights. Because we conclude the Commission acted within its statutory authority in determining the market value of TNMP's generation assets, we reject the Cities' and State Agencies' contentions.

Chapter 39 provides four specific methods that a utility may choose from to establish

12

the market value of its generation assets. *See* Tex. Util. Code Ann. § 39.262(h). TNMP chose to use the "sale-of-assets" method under section 39.262(h)(1). *See id.* § 39.262(h)(1). Under the sale-of-assets method, the market value is defined as the total value realized from a sale if, any time after December 31, 1999, the utility sells some or all of its generation assets in a "bona fide third-party transaction under a competitive offering." *Id.* Having sold its only generation asset, TNP One, to Sempra Energy Resources, TNMP asserted that the $120 million sales price of TNP One established the market value of its generation assets as required in section 39.262(h)(1). The ALJs agreed with TNMP that the sales price of TNP One established the market value of that asset as required under the statute, but the Commission disagreed. The Commission concluded that TNMP failed to establish market value through the sale of TNP One because TNMP failed to prove that the sale was a "bona fide third-party transaction under a competitive offering" as required in section 39.262(h)(1).[8]

TNMP's failure to establish market value through an asset sale left the Commission with the difficult task of quantifying TNMP's stranded costs without a demonstrated, bona fide asset sale to a third party. As TNP One had been sold, it was impossible for TNMP to use another method in section 39.262(h) to value the plant. The Commission concluded, however, that denying all recovery to TNMP would be contrary to the legislature's deregulation transition plan—of which stranded cost recovery is an integral part. *See* Tex. Util. Code Ann. § 39.252(a) (allowing utilities to recover net verifiable, nonmitigable stranded costs). The Cities and State Agencies argue that the

---

[8] None of the parties dispute this conclusion on appeal.

Commission lacked statutory authority to determine the market value of TNP One when the method selected by the utility fails to produce a proper market value. We disagree.

To determine the scope of the Commission's authority, we must read the PURA as a whole to determine the legislature's intent. *State v. Public Util. Comm'n*, 883 S.W.3d 190, 196 (Tex. 1994). The contemporaneous construction of a statute by the administrative agency charged with enforcing it is entitled to great weight. *Id.*; *see also Dodd v. Meno*, 870 S.W.2d 4, 7 (Tex. 1994); *Tarrant Appraisal Dist.*, 845 S.W.2d at 823. The legislature set forth a comprehensive scheme through which it has charged the Commission with authority to determine each utility's final stranded cost balance. *See generally* Tex. Util. Code Ann. §§ 39.001-.910. The legislature provided that each utility "is allowed to recover all of its net, verifiable, nonmitigable stranded costs." Tex. Util. Code Ann. § 39.252(a).

In this Court's recent *CenterPoint* decision, we considered a similar situation. *See CenterPoint*, 2007 Tex. App. LEXIS 9919, at *35-*52 (discussing CenterPoint's failure to satisfy requirements of partial stock valuation method). In that case, CenterPoint attempted to establish the market value of its generation assets using the partial stock valuation method in section 39.262(h)(3). *Id.* The Commission determined that CenterPoint did not comply with the statutory requirements because it failed to demonstrate that at least 19% of the transferred stock had been "spun off and sold to public investors through a national stock exchange" as required in section 39.262(h)(3). *Id.* The Commission concluded that none of the other statutory methods could be used to determine the market value of CenterPoint's generation assets because CenterPoint did not meet the statutory requirements for any of those methods. *Id.* at *52-*60. Accordingly, the Commission chose to use

14

the utilities code definition of "market value" to develop a substitute valuation method. *Id.* at *62-*63 (citing Tex. Util. Code Ann. § 39.251(4)). In the absence of a market valuation established under one of the prescribed methods in section 39.262(h), we upheld the Commission's implied authority to consider and use alternative methods for determining market value in order to carry out the "strong legislative mandate" of stranded cost recovery. *Id.* at *63-*67. In addition, we rejected claims by OPC and the customers of CenterPoint that, having failed to meet its burden of proof, CenterPoint was not entitled to any stranded cost recovery at all. *Id.* at *60-*62.

In this case, as in *CenterPoint*, the Commission determined—and none of the parties dispute—that TNMP failed to establish the market value of TNP One because it failed to meet the statutory requirements of section 39.2629(h)(1). In light of TNMP's failure to satisfy the statutory requirements, the Commission turned to the utilities code definition of "market value" in section 39.251(4) to determine the appropriate valuation of TNMP's generation assets. Section 39.251(4) defines "market value" as "the value the assets *would have* if bought and sold in a bona fide third-party transaction on the open market." Tex. Util. Code Ann. § 39.251(4). Based on this definition, the Commission concluded that it was proper to determine the market value TNP One *would have* if TNMP had initially conducted a bona fide transaction in compliance with section 39.262(h)(1).

Consistent with our decision in *CenterPoint*, we hold that the Commission properly considered an alternative valuation method based on the definition of market value in section 39.251(4) when TNMP failed to establish the market value of its generation assets in compliance with one of the four methods in section 39.262(h). *See CenterPoint*, 2007 Tex. App. LEXIS 9919, at *52-67. Likewise, we conclude that, given TNMP's failure to establish market value of TNP One

15

using one of the four methods in section 39.262(h), the Commission did not exceed its statutory authority when it developed an alternative valuation method based on the statutory definition of market value in section 39.251(4). *See id.* at *62-*63.

We next consider whether the Commission's determination of market value was reasonable and supported by substantial evidence. In conducting a substantial evidence review, we must determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion reached by the Commission—namely, that the market value of TNP One was $180 million. *City of El Paso*, 883 S.W.2d at 186; *Sizemore*, 759 S.W.2d at 116. The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. *Charter Med.*, 665 S.W.2d at 452. When weighing the testimony, the Commission may accept or reject part or all of each witness's conclusions; it is the final judge regarding the credibility and validity of such testimony. *Central Power & Light Co.*, 36 S.W.3d at 561; *Southern Union Gas Co. v. Railroad Comm'n*, 692 S.W.2d 137, 141-42 (Tex. App.—Austin 1985, writ ref'd n.r.e.).

The Commission determined that if TNMP's flawed auction process produced a sales price of $120 million, then a bona fide sale would have produced a higher price for TNP One. The record reflects that several parties presented evidence on the value of TNP One and the sales price TNMP would have received if it had conducted a proper sale. *See* Tex. Util. Code Ann. § 39.251(4). In the analysis prepared by TNMP witness Patrick Bridges, and relied on by the ALJs, a recent run-up in the prices of natural gas showed an increasing value for TNP One and a potential value to bidders of approximately $174 million. The ALJs also referenced notes made by a TNMP witness,

16

Rhonda Lenard, during the sales negotiations with Sempra where TNMP again referred to a value of $180 million for TNP One—a value that TNMP repeatedly stated it held as a reasonable value for TNP One. The record also showed that Austpro, another potential buyer for TNP One, indicated a possible bid of $188 million. Although Austpro never submitted a written bid, the Commission considered this amount to be in the upper range of prices that a bona fide sale would have produced.

Several parties also suggested alternative values for TNP One. TIEC witness, Steve Weyel, performed numerous calculations using "spark spread" discounted cash flow analysis and testified that these calculations suggested a range of $255 to $316 million. Cities witness, Lane Kollen, also provided testimony on the market value of TNP One. But these analyses also presumed a delayed sale of TNP One. The Commission rejected the testimony of Weyel and Kollen because it concluded that TNMP should not be penalized for its failure to delay the sale of TNP One. Based on the record evidence, the Commission concluded that a bona fide competitive offering would have captured the recent run-up in natural gas prices and would have produced a sales price of $180 million, net of expenses. Accordingly, the Commission determined that the appropriate market value for TNP One was $180 million.

The record before the Commission was extensive, and the Commission had ample evidence on which to base its determination of market value. The evidence regarding the market value of TNP One suggested a valuation between $174 million and $316 million. We conclude that the record contains substantial evidence to support a market value for TNP One within the range of evidence before the Commission. Given the admitted complexity of determining the market value of TNP One and the deference owed to the Commission in its area of expertise, we hold that there

17

is a reasonable basis for the Commission, in its discretion, to select a market value for TNP One within the range of evidence presented by the parties. *See City of El Paso*, 883 S.W.2d at 186 (affirming agency decision to select value within range of evidence in the record). We conclude that the Commission's market valuation of TNP One is supported by substantial evidence. We further conclude that the Commission's determination of market value was consistent with its statutory authority under the PURA and that the Commission did not create an extra-statutory method of stranded cost recovery. We overrule the Cities' first issue and the State Agencies' issues 1A and 1B.

2.      *Due Process*

The State Agencies further allege that the Commission's creation of an extra-statutory method of stranded cost recovery violates Due Process. Having determined that the Commission did not exceed its statutory authority or create an extra-statutory method of stranded cost recovery, we reject the State Agencies claim that the Commission violated Due Process. We overrule the State Agencies' issue 1C.

3.      *Adjustments to Book Value*

A)      *Accelerated depreciation*

In their second issue, the Cities argue that the Commission failed to effectuate TNMP's prior agreement to reduce stranded costs. This issue arises from TNMP's agreement in a previous proceeding before the Commission to apply accelerated depreciation to the book value of TNP One as a means to reduce stranded costs. *See Application of Texas-New Mexico Power Company for Approval of a Transition Plan and Statement of Intent to Decrease Rates*, Docket

18

No. 17751 (Tex. Pub. Util. Comm'n Nov. 4, 1998) (order on reh'g).  Because we conclude the Commission's reduction to the net book value of TNP One by $19,340,031 for accelerated depreciation was reasonable and supported by substantial evidence, we reject the Cities' argument.

To understand the Cities' argument on this issue, it is necessary to examine the Commission's prior order and the stipulation agreed to by TNMP.  In 1997, in anticipation of deregulation, TNMP filed an application with the Commission in Docket No. 17751 seeking approval of TNMP's plan to transition to a deregulated electric market.  *See id.*  The parties in that proceeding reached a stipulated agreement on TNMP's transition plan and submitted that stipulation to the Commission for approval.  The Commission incorporated the stipulation as part of the transition plan approved in its final order.  *See id.*  Under the transition plan approved by the Commission in Docket No. 17751, TNMP was to apply a total of $75 million in accelerated depreciation to the book value of TNP One—$15 million per year from 1999 through 2002, plus an additional $15 million—to reduce stranded costs:

> In addition to normal depreciation, TNMP shall recover additional depreciation on TNP One in the amount of $15,000,000 each year for the years 1999-2002.  In addition, TNMP shall record additional depreciation on TNP One of up to a total cumulative amount of $15,000,000 over the years 1998-2002, based on the amount available and calculated pursuant to the earnings sharing mechanism approved in this Order.

*Id.*

After the Commission approved TNMP's transition plan in Docket No. 17751, the legislature passed SB 7, which deregulated the retail electric market.  Chapter 39 of the utilities code differed from the stipulation agreed to by TNMP in Docket No. 17751.  One of the primary

19

differences was that retail competition began in 2002, not 2003 as contemplated by the stipulation. *See* Tex. Util. Code Ann. § 39.001(b)(1) (implementing customer choice on January 1, 2002). Over the ensuing years, the Commission dealt with several proceedings trying to reconcile the promises made by TNMP in Docket No. 17751 with Chapter 39.[9] In this final stranded cost true-up proceeding, the Commission again faced the need to reconcile the stipulation and transition plan approved in Docket No. 17751 with the requirements in Chapter 39.

The issue for the Commission in this case was how to reconcile TNMP's promises to apply accelerated depreciation in the transition plan with the requirement in section 39.261(c)(2) of the PURA to apply excess earnings from 1999-2001 to reduce the net book value of generation assets. *See id.* § 39.261(c)(2). The record reflects that TNMP had excess earnings of $40,659,969 for 1999-2001 and did not book the accelerated depreciation required under the stipulation and transition plan for these years. Based on TNMP's stipulation in Docket No. 17751, the Commission determined that TNMP should apply a total of $60 million in accelerated depreciation to reduce the net book value of TNP One, thereby reducing its stranded costs.[10] The Commission observed that if TNMP had actually booked the accelerated depreciation as required under the stipulation and transition plan approved in Docket No. 17751, TNMP would not have had $40.6 million in excess earnings for 1999-2001. Accordingly, the Commission subtracted the $40.6 million in excess

---

[9] The Commission's final order in Docket No. 17751 expressly states that TNMP's 1998 transition plan must be reconciled with any later-enacted deregulation legislation. *Application of Texas-New Mexico Power Company for Approval of a Transition Plan and Statement of Intent to Decrease Rates*, Docket No. 17751 (Tex. Pub. Util. Comm'n Nov. 4, 1998) (order on reh'g).

[10] The Commission did not require TNMP to apply accelerated depreciation for 2002, since retail competition began January 1st of that year.

earnings that TNMP already applied to reduce its stranded costs from the $60 million total, leaving $19,340,031 in additional depreciation for TNMP to apply to the net book value of TNP One. This is the adjustment that the Commission made to the net book value of TNP One.

Section 39.252(a) allows a utility to recover "all of its net, verifiable, nonmitigable stranded costs." Tex. Util. Code Ann. § 39.252(a). However, the legislature imposed a statutory duty on each utility to pursue commercially reasonable means to reduce its potential stranded costs. *Id.* § 39.252(d). In addition, for those utilities identified as having positive stranded costs in the Commission's 1998 ECOM Report[11] to the Texas Senate Interim Committee on Electric Restructuring, the legislature required those utilities to take additional steps to reduce the net book value of, or "accelerate" the recovery of, stranded costs by returning excess earnings to their Texas customers. *Id.* §§ 39.254, .257. Under section 39.254, these excess earnings "shall be applied to the net book value of generation assets." *Id.* § 39.254. Because TNMP was one of the utilities identified as having positive stranded costs in the 1998 ECOM Report, TNMP was required to apply its excess earnings from annual reports to reduce the net book value of its generation assets. *Id.*

The legislature charged the Commission with enforcing the utilities' obligations to mitigate stranded costs. In section 39.252(a), the legislature expressly provided that a utility "may not be permitted to overrecover stranded costs." *Id.* § 39.262(a). Thus, the Commission was required to ensure that TNMP properly applied its excess earnings to reduce the net book value of its generation assets.

---

[11] Public Utility Commission of Texas, Report to the Texas Senate Interim Committee on Electric Restructuring, "Potentially Strandable Investment (ECOM) Report: 1998 Update" (Apr. 30, 1998) (hereafter "1998 ECOM Report").

The Cities complain that the Commission should not have offset TNMP's obligation to apply $60 million in accelerated depreciation with TNMP's excess earnings mitigation because there is no connection between TNMP's prior agreement to apply accelerated depreciation in Docket No. 17751 and the excess earnings mitigation requirement in Chapter 39 of the PURA. *See id.* §§ 39.254, .257, .261. Given the Commission's obligation to ensure that TNMP complies with its own obligation to apply excess earnings to reduce net book value and does not overrecover stranded costs, we agree with the Commission that this offset was reasonable and necessary to avoid "double counting."

The record reflects that the Commission's order in Docket No. 17751 required it to reconcile TNMP's promise to apply accelerated depreciation as a means to reduce stranded costs with the legislature's deregulation plan in Chapter 39 of the PURA. The record further reflects that if TNMP had booked the accelerated depreciation required under the stipulation and transition plan approved in Docket No. 17751, TNMP would not have had $40.6 million in excess earnings with which it could have further mitigated stranded costs as required under section 39.254 of the PURA. We therefore conclude that the Commission's decision to offset TNMP's promise to reduce stranded costs by $60 million with TNMP's $40.6 million in excess earnings for 1999-2001 was reasonable and comports with the Commission's obligation to ensure that TNMP applies its excess earnings to reduce net book value and does not overrecover stranded costs. *See* Tex. Util. Code Ann. §§ 39.254, .252(a), (d), .262(a); *see also In re Entergy*, 142 S.W.3d 316, 324 (Tex. 2004) (Commission has exclusive jurisdiction to adjudicate disputes arising from agreements incorporated into

22

Commission orders); *Public Util. Comm'n v. Southwestern Bell Tel. Co.*, 960 S.W.2d 116, 119-20 (Tex. App.—Austin 1997, no pet.) (Commission has discretion to formulate and award remedy necessary to effectuate parties' agreement).  We overrule the Cities' second issue.

### B)      Investment Tax Credits

In its third issue,  TNMP claims that the Commission erred in reducing TNMP's net book value by $6,490,000 for investment tax credits.  TNMP claims that the Commission lacked authority to make this reduction because section 39.251(7) of the PURA—the section defining stranded costs—fails to reference investment tax credits.  Because we conclude the Commission's treatment of investment tax credits was proper, we reject TNMP's claim.

Like accelerated depreciation, Congress created investment tax credits to spur economic development.  *See, e.g.*, *Central Power & Light Co. v. Bullock*, 696 S.W.2d 30, 31 (Tex. App.—Austin 1984, no writ); *see generally Application of Normalization Accounting Rules to Balances of Excess Deferred Income Taxes and Accumulated Deferred Investment Tax Credits of Public Utilities Whose Generation Assets Cease to be Public Utility Property*, 68 Fed. Reg. 10190 (IRS Mar. 4, 2003).  Businesses were given tax credits for making certain capital investments. *Bullock*, 696 S.W.2d at 31.  Such credits were viewed as benefits to the utility that must ultimately be passed on to ratepayers.  *See id.* at 32.  Because Congress wanted to ensure that public utilities would have those sums to invest, the IRS required each public utility to segregate investment tax credits into a separate account for regulatory purposes. *See Application of Normalization Accounting*

*Rules*, 68 Fed. Reg. at 10191. In a process called "normalization," the IRS further required that the credit amounts be amortized for return to ratepayers over the life of the asset.[12] *See id.* at 10191-92.

The record reflects, at the time it filed for stranded cost recovery, TNMP held slightly more than $15 million in its investment tax credit account. The Commission concluded that this amount represented benefits received by TNMP that had yet to be passed on to ratepayers. Cities witness, Kollen, testified that TNMP's stranded costs should be reduced by the entire amount of TNMP's investment tax credit account. In contrast, Commission staff witness, Darryl Tietjen, testified that TNMP's stranded costs should only be reduced by the present value of TNMP's investment tax credit balance, or $6.49 million. The Commission adopted Tietjen's recommendation and reduced the book value of TNP One accordingly.

TNMP argues that the Commission lacked authority to make this reduction because nothing in the definition of stranded costs references "investment tax credits." *See* Tex. Util. Code Ann. § 39.251(7). TNMP further argues that the Commission erred in relying on section 36.059 of the PURA to support its reduction because that section does not apply to this stranded cost true-up proceeding. *See id.* § 36.059. Accordingly, TNMP maintains there is no legal basis in the PURA to support the Commission's reduction to book value for investment tax credits. We disagree.

In directing the Commission to finalize and determine each utility's stranded cost balance, the legislature provided that the utility shall only recover its "net, verifiable, nonmitigable stranded costs." *Id.* § 39.252(a). The legislature further provided that a utility shall not overrecover

---

[12] None of the parties have raised the issue of a potential normalization violation; therefore, we do not address it. *Cf. CenterPoint*, 2007 Tex. App. LEXIS 9919, at *105-18 (remanding Commission's final order to consider remedy for normalization violation).

its stranded costs. *Id.* § 39.262(a). Cities witness, Kollen, testified that allowing TNMP to retain investment tax credits would allow TNMP to overrecover stranded costs.[13] Based on this testimony and the legislative mandate that utilities shall not overrecover stranded costs, we conclude that the Commission acted within its authority under Chapter 39 of the PURA to reduce the net book value of TNMP's generation assets by the present value of TNMP's investment tax credit account. We also conclude that the Commission's decision is supported by substantial evidence.[14] *See id.* § 39.262(a); *Charter Med.*, 665 S.W.2d at 452; *Central Power & Light*, 36 S.W.3d at 561. We overrule TNMP's third issue.

### 4. Interest

In their third issue, the Cities dispute the Commission's calculation of interest on TNMP's final stranded cost balance. The Cities argue that the Commission acted arbitrarily and capriciously in applying different interest rates to TNMP's final fuel balance and final stranded cost balance. As a result of this alleged discrimination, the Cities argue that the Commission has allowed TNMP to overrecover stranded costs in violation of section 39.262 of the PURA. Because we conclude that the Commission's application of different interest rates to TNMP's final fuel balance

---

[13] The Commission's reduction to TNMP's stranded costs is consistent with its previous decision in Docket 22349 in which the Commission first estimated TNMP's stranded costs. In that docket, the Commission also required TNMP to include investment tax credits as a reduction to book value and, therefore, to stranded costs.

[14] In light of our determination that the Commission's reduction to book value for investment tax credits was within the Commission's authority under Chapter 39 of the PURA, we reject TNMP's complaint that the Commission erroneously relied on section 36.059.

and final stranded cost balance comports with the statute and Commission rules and was supported by substantial evidence, we reject the Cities' arguments.

Less than two months after the Commission issued its final order in this case, the supreme court released its opinion in *CenterPoint Energy*. The supreme court invalidated part of PUC Substantive Rule 25.263—the Commission's rule governing stranded cost true-up proceedings. 143 S.W.3d at 81; *see* 16 Tex. Admin. Code § 25.263 (2005). Specifically, the supreme court invalidated rule 25.263(l)(3), holding that carrying charges on a utility's final stranded cost balance should be calculated from January 1, 2002—the date customer choice began—instead of from the date of the final true-up order, which could be two or more years later, as provided in the rule. 143 S.W.3d at 84. In accordance with the supreme court's decision, the Commission granted rehearing and remanded this case to SOAH for additional proceedings to determine the interest due on TNMP's final stranded cost balance.

### A) Interest rate for stranded costs

The Commission's rule requires the interest rate for stranded costs to be calculated based on TNMP's weighted average cost of capital ("WACC"). *See* 16 Tex. Admin. Code § 25.263(l)(3)(A)(i). The record reflects that the Commission applied an interest rate of 10.93% to TNMP's final stranded cost balance. This interest rate was within the range of evidence submitted by the parties. TNMP's expert witness testified that the Commission should apply an interest rate of 11.59% to TNMP's final stranded cost balance. The Cities' expert witness, Scott Norwood, testified that the Commission should apply a rate of 8.31%. The Office of Public Utility Counsel proposed an interest rate of 9.8%. And the Commission staff recommended an interest rate of 10.93%.

Because the Commission's chosen interest rate of 10.93% falls within the range of evidence submitted by the parties, we conclude that there is a reasonable basis in the record to support the Commission's application of an interest rate of 10.93%. *See City of El Paso*, 883 S.W.2d at 186. Thus, we conclude the Commission's chosen interest rate is supported by substantial evidence.

### B) Interest rate for final fuel balance

Section 25.263(h)(4) of the Commission's true-up rule governs the interest rate to be applied to a utility's final fuel balance.[15]  16 Tex. Admin. Code § 25.263(h)(4) (2005).  Section 25.263(h)(4) gives two options for the Commission to use when determining the interest rate for a utility's final fuel balance.  The first option requires the Commission to use the utility's WACC when the period between the issuance of the utility's final fuel reconciliation order and the date of the final true-up order is more than one year.  Under the second option, the Commission must use

---

[15]  Section 25.263(h)(4) provides:

The final fuel balance, as adjusted by paragraphs (2) and (3) of this subsection, shall include carrying costs on the positive or negative fuel balance equal to:

(A)  the weighted-average cost of capital approved in the company's unbundled cost of service (UCOS) proceeding, if the period until the date of the final true-up order is greater than one year; or

(B)  the rate approved in § 25.236 of this title (relating to Recovery of Fuel Costs) if the period until the date of the final true-up order is one year or less.

16 Tex. Admin. Code § 25.263(h)(4) (2005).  This portion of the Commission's rule was not at issue in the supreme court's *CenterPoint Energy* decision.  *See generally CenterPoint Energy Inc. v. Public Util. Comm'n*, 143 S.W.3d 81 (Tex. 2004) (invalidating PUC Subst. Rule 25.263(l)(3)).

the short-term interest rate approved in PUC Substantive Rule 25.236 if the period between the final fuel reconciliation order and the final true-up order is one year or less.

Because the Commission issued TNMP's final fuel reconciliation order on February 11, 2004, TNMP's witness estimated that the Commission's order in the stranded cost true-up proceeding would be issued within six months and proposed using the short-term interest rate of 1.17%[16] approved in PUC Substantive Rule 25.236. Although the parties disputed the interpretation of section 25.263(h)(4), the Commission agreed with TNMP and applied the short-term interest rate of 1.17%.

The Commission's determination was based upon its interpretation of rule 25.263(h)(4). As the Commission explained in its order on rehearing,

> [T]he appropriate period for determining which interest rate applies is measured from the date the Commission issues its order in the final fuel reconciliation and can therefore, be different than the actual time period to which the rate applies. Otherwise, there would have been no reason to include the words "one year or less" in the rule since the period between the end of the reconciliation period and the earliest *filing* of the true-up was known to be two years when the rule was written.

We defer to the Commission's interpretation of its own rule unless it is plainly erroneous or inconsistent with the language of the rule. *See Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991) ("Our review is limited to determining whether the administrative interpretation is plainly erroneous or inconsistent with the regulation." (internal quotation omitted)); *Gulf Coast Coalition of Cities v. Public Util. Comm'n*, 161 S.W.3d 706,

---

[16] This was the short-term interest rate as of the date TNMP filed its application to finalize stranded costs.

712 (Tex. App.—Austin 2005, no pet.). We conclude that the Commission's interpretation of section 25.263(h)(4) comports with the plain language of the rule. Under this interpretation, the Commission properly applied the short-term interest rate to TNMP's final fuel balance. We further conclude that the Commission's decision was supported by substantial evidence.

To the extent the Cities complain that the Commission applied different interest rates to TNMP's final stranded cost balance and final fuel balance to the disadvantage of TNMP's customers, we reject that complaint. The Commission's application of different interest rates was reasonable, was supported by the record, and comports with the Commission's rules. We overrule the Cities' third issue.

### 5. *Capacity auction true-up*

In TNMP's first issue, it complains that the Commission erred in summarily denying TNMP's capacity auction true-up claim for $106 million. Prior to the evidentiary hearing in this case, the Commission issued a Supplemental Preliminary Order ruling on the threshold issue of whether TNMP was entitled to a capacity auction true-up. In this order, the Commission concluded that TNMP was not entitled to a capacity auction true-up because TNMP did not conduct a capacity auction. Because we conclude that the Commission's decision was reasonable and consistent with the relevant statutes and Commission rules, we reject TNMP's complaint.

To encourage competition in the newly emerging retail market, the legislature required utilities with more than 400 megawatts of installed generation capacity to auction off 15%

29

of their capacity prior to January 1, 2002. *See* Tex. Util. Code Ann. § 39.153(a);[17] *see also*

*CenterPoint*, 2007 Tex. App. LEXIS 9919, at *126-*132 (describing capacity auction process and

true-up). Because TNMP had less than 400 megawatts of installed generation capacity, TNMP was

exempt from the capacity auction requirement in section 39.153. *See* Tex. Util. Code Ann.

§ 39.153(a). TNMP was the only utility to fall within the statutory exemption.[18] To prevent

any utility from exercising undue market power, the legislature, in section 39.156, also required

certain utilities to reduce their ownership and control of installed generation capacity and file market

mitigation plans with the Commission. *See id.* § 39.156. One of the options available to those

utilities required to reduce their capacity under section 39.156 was a capacity auction. *Id.*

§ 39.156(c)(3). As part of the final proceeding to true-up stranded costs, section 39.262(d) of the

---

[17] Section 39.153(a) provides:

> Each electric utility subject to this section shall sell at auction, at least 60 days before
> the date set for customer choice to begin, entitlements to at least 15 percent of the
> electric utility's Texas jurisdictional installed generation capacity. *For the purposes
> of this section, the term "electric utility"* includes any affiliated power generation
> company that is unbundled from the electric utility in accordance with Section
> 39.051, but *does not include any entity owning less than 400 megawatts of installed
> generation capacity.*

Tex. Util. Code Ann. § 39.153(a) (emphases added).

[18] The record reflects that, prior to the passage of SB 7, TNMP sought and obtained from the
legislature an exemption from the capacity auction requirement. *See* Senate Special Comm. on Elec.
Util. Restructuring, 76th Leg., R.S. 13 (Mar. 13, 1999) (transcript available from Senate Staff
Services Office). This exemption was valuable to TNMP. In light of this exemption, TNMP did not
have to participate in a capacity auction, and it was the only incumbent utility allowed to retain
control of 100% of its capacity.

PURA required the Commission to true-up the capacity auction for each utility that auctioned capacity under section 39.153 or 39.156. *Id.* § 39.262(d).[19]

TNMP agrees that it was exempt from the capacity auction requirement in section 39.153 and that it did not conduct a capacity auction pursuant to either section 39.153 or 39.156. Nevertheless, TNMP argues that the legislature's use of the word "shall" in section 39.262(d) is mandatory and requires the Commission to conduct a capacity auction true-up for TNMP. We disagree.

The plain language of section 39.262(d)(2) requires the Commission to reconcile the difference between "the price of power *obtained through the capacity auctions under Sections 39.153 and 39.156*" and the power cost projections that were employed to estimate stranded costs in the proceeding under section 39.201. *See* Tex. Util. Code Ann. § 39.262(d)(2) (emphasis added). The plain language of this statute also presumes that TNMP participated in the required capacity

---

[19] Section 39.262(d) provides:

The affiliated power generation company shall reconcile, and either credit or bill to the transmission and distribution utility, the net sum of:

(1) the former electric utility's final fuel balance determined under Section 39.202(c); and

(2) any difference between the price of power obtained through the capacity auctions under Sections 39.153 and 39.156 and the power cost projections that were employed for the same time period in the ECOM model to estimate stranded costs in the proceeding under Section 39.201.

*Id.* § 39.262(d).

31

auctions. Because TNMP did not conduct a capacity auction pursuant to section 39.153 or 39.156, the Commission concluded there was nothing to reconcile in a capacity auction true-up for TNMP.

The Commission's interpretation of section 39.262(d) is reasonable and consistent with the plain language of the statute. Because the legislature expressly exempted TNMP from the capacity auction requirement, we are unpersuaded that the legislature intended the Commission to conduct a capacity auction true-up for TNMP.[20] We overrule TNMP's first issue.

### 6.    "Grossing up" disallowances

In its second issue, TNMP claims that the Commission erred in "grossing up" disallowances to capture tax benefits resulting from TNMP's stranded cost recovery.[21] Because we conclude that the Commission acted within its authority under the PURA to "gross up" disallowances when calculating TNMP's stranded costs, we reject TNMP's claim.

Section 39.262(c) expressly requires TNMP to file its application to finalize stranded costs with the Commission. *See* Tex. Util. Code Ann. § 39.262(c). TNMP does not dispute the Commission's authority to calculate TNMP's final stranded cost balance. Rather, TNMP argues that the Commission lacks discretion to make adjustments to the various components that comprise

---

[20] To the extent TNMP relies on PUC Substantive Rule 25.281 to support its argument, we are likewise unpersuaded by that argument. It is axiomatic that an agency may not enact rules inconsistent with its statutory authority. *See, e.g.*, *Railroad Comm'n v. Lone Star Gas*, 844 S.W.2d 679, 685 (Tex. 1992); *State Bd. of Ins. v. Deffebach*, 631 S.W.2d 794, 798 (Tex. App.—Austin 1982, writ ref'd n.r.e.). The language of the rule is consistent with the statute. Having thus concluded that section 39.262(d) of the PURA does not require the Commission to conduct a capacity auction true-up, we likewise conclude there is no requirement to do so under the Commission's rules.

[21] TNMP does not challenge the disallowances, nor does TNMP challenge the Commission's authority to disallow certain costs when finalizing TNMP's stranded cost balance.

TNMP's stranded cost balance. We disagree. The legislature expressly provided that a utility may recover all of its net, verifiable, nonmitigable stranded costs, but that a utility may not overrecover stranded costs. *See id.* § 39.252(a), .262(a). Thus, the Commission's authority to adjust the various components comprising TNMP's stranded cost balance is grounded in its authority to ensure that TNMP does not overrecover stranded costs. *See id.* § 39.262(a).

In this case, as part of its request to recover stranded costs, TNMP sought to retain its account balance for accumulated deferred federal income tax (ADFIT) to cover its tax liability on its stranded cost recovery. As the Commission explained in its final order, the ADFIT account balance reflects the regulatory expectation that TNMP would eventually recover the book value of TNP One through depreciation. During the early years of accounting for certain assets, like TNP One, the ADFIT balance grows because the regulatory tax expense paid by ratepayers exceeds the utility's actual tax expense. This trend reverses in later years when the utility's actual tax expense exceeds its regulatory tax expense, and the ADFIT account balance will ultimately reach zero. Under continuing regulation, TNMP's ADFIT account balance related to depreciation would have ultimately reached zero.

But TNMP will now recover the book value of TNP One as proceeds from the sale of that asset and as stranded costs. If the entire book value is recovered, the ADFIT account will satisfy TNMP's tax burden with respect to its stranded cost recovery and will ultimately reach zero. Where, as here, the Commission made adjustments to both the book value and market value of TNP One, TNMP will not recover the entire book value of TNP One. As a result, TNMP will not incur a tax liability on the amounts not recovered, and the ADFIT account balance will never reach zero.

33

Stated differently, without "grossing up" the disallowances made by the Commission, TNMP will retain the remaining balance in its ADFIT account and will therefore overrecover stranded costs.

Section 39.262(a) expressly precludes TNMP from overrecovering stranded costs. Tex. Util. Code Ann. § 39.262(a). Because the Commission has disallowed recovery of certain costs associated with TNP One, TNMP will not owe federal income tax on those costs, and TNMP will not need the associated ADFIT balance. Were the Commission not to "gross up" these disallowances, TNMP would overrecover stranded costs. Given the express legislative command that a utility may not be permitted to overrecover stranded costs, *see* Tex. Util. Code Ann. § 39.262(a), we conclude that the Commission acted within its authority to "gross up" disallowances and thereby prevent TNMP from overrecovering stranded costs. We overrule TNMP's third issue.

## CONCLUSION

Having overruled the parties' issues on appeal, we affirm the judgment of the district court affirming the Commission's final order.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: January 25, 2008

34