# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-07-00196-CV

**Appellants, AEP Texas Central Company; the State of Texas,
by and through the Office of the Attorney General, Consumer Protection
and Public Health Division, Public Agency Representation Section; et al.
// Cross-Appellant, Public Utility Commission of Texas**

**v.**

**Appellee, Public Utility Commission of Texas// Cross-Appellees, AEP Texas
Central Company; the State of Texas, by and through the Office of the
Attorney General, Consumer Protection and Public Health Division,
Public Agency Representation Section; et al.**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. D-1-GV-06-000827, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## C O N C U R R I N G   O P I N I O N

We withdraw the opinion issued May 23, 2008 and issue the following opinion and in its place.

We join with Justice Patterson in the judgment regarding most of the parties' issues (as the Court's recent opinion in *CenterPoint Energy Houston Elec.*, *LLC v. Gulf Coast Coalition of Cities*, No. 03-05-00557-CV, ___ S.W.3d ___, 2007 Tex. App. LEXIS 9919 (Tex. App.—Austin Dec. 20, 2007, no pet. h.) controls many of them) but diverge with regard to whether the Commission's adjustments to the net book values of the South Texas Project and

the Coleto Creek coal plant violated PURA section 39.252(d).[1]  We affirm the district court's judgment that the Commission lacked statutory authority to make these adjustments.  Also, because Justice Patterson's more expansive view of the Commission's power also undergirds her analysis of the Joint Intervenor's seventh issue concerning book-value adjustments related to bridge power-sales agreements,[2] we similarly differ in our analysis, though we ultimately join her in the judgment affirming the Commission and district court regarding that issue.

**PURA 39.252(d) and book-value adjustments to STP and Coleto Creek**

This issue turns on a question of statutory construction:  simply put, whether an electric utility's conduct of a sale of its generation assets can meet the requirements of a "bona fide third-party transaction under a competitive offering" under PURA 39.262(h) and nonetheless violate the utility's duty to mitigate stranded costs through commercially reasonable means.

The now-familiar term "stranded costs" under PURA chapter 39 refers generally to "the portion of the book value of a utility's generation assets that is projected to be unrecovered through rates that are based on market prices," *Cities of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 685 (Tex. App.—Austin 2003, pet. denied) (quoting *In re TXU*, 67 S.W.3d 130, 132 (Tex. 2001) (Phillips, C.J., concurring)), thereby "stranding" costs of the utility's prior investments in generation assets that would have been recoverable under the prior rate-regulated regime. *Id.*  (observing that "[s]tranded costs are a potential byproduct of Texas's transition from

---

[1]  Part II.C.2(A)(i) & (ii) of Justice Patterson's opinion.

[2]  Part II.C.2(A)(iii) of Justice Patterson's opinion.

the former rate-regulated electricity system to competition"). Among the legislature's "foundational" policy goals in PURA chapter 39 was ensuring that incumbent, formerly integrated electric utilities could recover their stranded costs so as to eliminate this competitive disadvantage they would face against new market entrants. *Id.* ("Because the new market entrants would not have these embedded generation-related costs and opportunity cost reflected in the rate of return, their pricing structure would tend to be lower than that of incumbent utilities . . . enabl[ing] new market entrants to price electricity below a level at which incumbent utilities could recover their investments" forcing them either to "charge uncompetitive higher rates or simply absorb these 'stranded costs.'").

"Conceptually, stranded costs under chapter 39 of the utilities code *exist* as of the last day before the opening of retail competition, December 31, 2001 [but] accurate *calculation* of such costs could take years, as a utility may not know whether it has been able to recover the millions of dollars spent on a generation-related asset until it sells the last kilowatt generated by that asset." *Id.* at 691-92 (citing *In re TXU*, 67 S.W.3d at 147 (Brister, J., concurring)). The legislature opted to sacrifice some of the certainty and accuracy of a long-term calculation of stranded costs under actual market conditions (e.g., the extent to which the rates the utility could charge under competitive conditions during the life of the generation asset ultimately enabled it to recoup its investments in the asset) in favor of providing "finality regarding the issue to facilitate the transition to a competitive electricity market by 2008." *Id*. at 692. It "mandated that the 2004 true-up calculation would be the final, controlling calculation of each utility's stranded costs." *Id*. However, the focus of this calculation remained whether, under actual market conditions, the utility could recover its stranded costs. In lieu of relying on long-term actual performance of the assets in the competitive

retail electric market, the legislature looked to a measure that would reflect a market judgment of the assets' anticipated future performance under that regime—the market value of the generation assets under the competitive regime. *See* Tex. Util. Code Ann. § 39.262 (West 2007).

Subsection (h) of PURA 39.262 requires that "[f]or the purpose of finalizing the stranded cost estimate . . . the affiliated power generation company shall quantify its stranded costs" through one of four prescribed alternative market-based measures of the market value of its generation assets. *See* Tex. Util. Code Ann. § 39.262(h).[3] The legislature has imposed detailed requirements and limitations governing the use of each measure aimed at ensuring the integrity of the underlying market mechanisms. Of relevance here, the "sale of assets" method of valuation may be used only if an electric utility or its affiliated power generation company has sold some or all of its generation assets in a "bona fide third-party transaction under a competitive offering." *Id.* § 39.262(h)(1). The Commission has construed "bona fide, third-party transaction under a competitive offering" to mean one in which "the seller conducts itself in a manner that a reasonable person would act in an ordinary commercial transaction without the benefit of stranded-cost recovery to protect that person's financial interests."[4] Aspects of such behavior by a seller include "giv[ing] serious consideration to understanding the market and acquiring competent financial advice," "encourag[ing] bidders to participate and negotiate reasonably," "provid[ing] all bidders equal and accurate information on the assets," and "[i]mportantly . . . negotiat[ing] vigorously with potential

---

[3] Subsection (i) provides an alternative measure for certain nuclear assets. We agree with Justice Patterson that this provision is effectively a default that applies in certain situations when the valuation methods of subsection (h) cannot be utilized.

[4] Final Order at 13.

4

buyers to obtain a price reflective of the value of the asset."[5] Additionally, the "bona fide aspect of the transaction required by section 39.262(h)(1)," the Commission has explained, entails "one in which the seller is sincerely and honestly intent upon obtaining a price for his assets that reflects a true market value so as to minimize stranded costs" and "does not unduly rely on stranded-cost recovery," "is evidenced by the seller's faithfulness to the twin obligations of both obtaining a true market value and minimizing stranded costs," and "comports with reasonable commercial standards when viewed in its entirety."[6] "In addition to being a bona-fide transaction," the Commission has stated, "a sale of assets under PURA § 39.262(h)(1) must also be competitive," and that a "competitive offering" denotes one involving "multiple entities all seeking to purchase the same generation assets at the same time, and all subject to the same set of rules."[7] "At the end of the competitive sales process, when the seller has focused on one bidder and is negotiating with that party," the Commission adds, "the buyer and seller must negotiate vigorously."[8]

Assuming the company complies with the prescribed requirements for the asset-sale or other market-based valuation method under PURA 39.262(h), the valuation yielded establishes the market value of the generation assets that the Commission must employ in its final stranded cost estimate. *See* Tex. Util. Code Ann. § 39.262(h)(1)-(4).[9] In circumstances where a utility fails to

---

[5] *Id.*

[6] *Id.* at 14.

[7] *Id.* at 14-15.

[8] *Id.* at 15.

[9] The same is true regarding a valuation under subsection (i), when applicable. *Id.* § 39.262(i).

comply with the requirements for using one of these methods, this Court has recently recognized that the Commission has limited, implied statutory authority to determine the market value that one of the statutory methods *would have* yielded had it been fully complied with. *CenterPoint*, ___ S.W.3d at ___, 2007 Tex. App. LEXIS 9919, at *53-54 (implied power derives from "clear legislative mandate that utilities be allowed to recover their stranded costs" and fact that "nothing in the code indicates that the failure of a utility to satisfy one of the market-valuation requirements should result in an automatic denial of the right to recover any stranded costs"); *see also State v. Public Util. Comm'n*, No. 03-06-00503-CV, ___ S.W.3d ___, ___, 2008 Tex. App. LEXIS 563, at *23 (Tex. App.—Austin Jan. 25, 2008, pet. filed) (further observing that chapter 39 defines "market value" as "the value the asset *would have if* bought and sold in a bona fide third-party transaction on the open market") (emphasis added).

On the other hand, although PURA chapter 39 reflects the legislature's policy goal that electric utilities recover their stranded costs as part of Texas' transition to retail electric competition, "there were express limitations imposed on this right." *CenterPoint*, ___ S.W.3d at ___, 2007 Tex. App. LEXIS 9919, at *10. Utilities are entitled to recover only their "net, verifiable, *nonmitigable* stranded costs incurred in purchasing power and providing electrical generation service," Tex. Util. Code Ann. § 39.252(a) (West 2007) (emphasis added), and have an affirmative obligation to "pursue commercially reasonable means to reduce [their] stranded costs, including good faith attempts to renegotiate above-cost fuel and purchased power contracts or the exercise of normal business practices to protect the value of its assets." *Id.* § 39.252(d); *see Reliant Energy, Inc. v. Public Util. Comm'n*, 101 S.W.3d 129, 149 (Tex. App.—Austin 2003),

*rev'd on other grounds*, *CenterPoint Energy, Inc. v. Public Util. Comm'n*, 143 S.W.3d 81 (Tex. 2004) (op. on reh'g) ("Compliance with the duty to pursue commercially reasonable means to mitigate its potential stranded costs is part of what makes stranded costs non-mitigable."). The Commission is statutorily empowered to enforce these limitations when calculating an electric utility's final stranded-cost estimate. A utility "may not be permitted to overrecover stranded costs through the procedures established by [PURA 39.262] or through the application of the measures provided by the other sections of this chapter." Tex. Util. Code Ann. § 39.262(a). Further, in PURA 39.252(d), the legislature mandated that "the commission shall consider the utility's efforts under this subsection [to "pursue commercially reasonable means to reduce its potential stranded costs"] when determining the amount of the utility's stranded costs." Tex. Util. Code Ann. § 39.252(d); *see Reliant*, 101 S.W.3d at 147 (observing that PURA 39.252 supplies a statutory incentive for utilities to maintain or increase the market value of their generation assets, countering potential incentives to depress market value in order to increase stranded-cost recovery). But the legislature added an important qualification to this power: "*provided, however, that nothing in this section authorizes the commission to substitute its judgment for a market valuation of generation assets determined under Section 39.262(h) and (i).*" Tex. Util. Code Ann. § 39.252(d) (emphasis added).

Because PURA 39.252(d) requires the Commission to "consider" a utility's stranded-cost mitigation efforts in its final stranded-cost estimate while also prohibiting it from substituting its judgment for the market valuation of generation assets yielded under PURA 39.262(h) and (i), this Court has deduced that the legislature "impliedly contemplate[d] some sort of adjustment to book value—the only other component of stranded costs." *Reliant*, 101 S.W.3d at

149; *see* Tex. Util. Code Ann. § 39.251(7) (West 2007) ("'Stranded cost' means the positive excess of the net book value of generation assets over the market value of the assets . . . ."); *State v. Public Util. Comm'n*, ___ S.W.3d at ___, 2008 Tex. App. LEXIS 563, at *15 (summarizing stranded-cost "formula" as "SC = NBV - MV").

Purporting to rely on this authority, the Commission reduced the book value of TCC's share in STP and the Coleto Creek coal plant based on what it found to have been TCC's commercially unreasonable conduct in connection with its sales of those assets under PURA 39.262(h)(1). The Commission deemed commercially unreasonable what it termed TCC's failure to "fully analyze the value" of its STP share before offering it for sale and stated that such actions would have enabled TCC "to determine whether the bids received from the auction were appropriate, and . . . cease[] negotiations with bidders if it became apparent that the negotiations were not producing an appropriate price." It also found unreasonable TCC's "bundling" of the Coleto Creek plant for sale with older gas plants without "explor[ing] other avenues of valuing the gas plants," such as selling them for "land, water rights, and scrap." At the same time, however, the Commission found that TCC's sales of both generation assets met the standards for "bona fide third-party transaction[] under a competitive offering" under PURA 39.262(h)(1). No party to this proceeding challenges the latter determinations, with the exception of the Joint Appellants' issue disputing whether TCC's sale of its STP share met this standard, and this panel has unanimously rejected that challenge.

The parties dispute whether, as a matter of law, the Commission's power to adjust the book value of generation assets based on findings of commercial unreasonableness in failing to

8

mitigate stranded costs extends to conduct during a sale of those assets that complies with the "bona fide third-party transaction under a competitive offering" standard of PURA 39.262(h)(1). TCC urges that "[a] sale in compliance with section 39.262(h)(1) is legally sufficient as a matter of law *because* it complies with this statutory divestiture provision." The Commission and Joint Appellants insist that any dispute with the Commission's authority to make book-value adjustments to account for commercially unreasonable conduct in any context was foreclosed by this Court in *Reliant*. TCC would distinguish *Reliant* as addressing only whether the Commission had *some* authority to make book-value adjustments to account for the effects of a utility's commercially unreasonable conduct, not whether that authority extended to making such adjustments under the particular circumstances presented here.

We agree with TCC that *Reliant* does not control our disposition of this issue. *Reliant* involved a declaratory-judgment action brought by a utility under PURA 39.001(e) challenging the validity of the Commission's rule 25.253(e)(4), which implemented section 39.252(d) by authorizing the Commission to adjust net book value to correct for commercially unreasonable conduct. The utility argued that the limitation of section 39.252(d)'s final clause—"provided, however, that nothing in this section authorizes the commission to substitute its judgment for a market valuation of generation assets determined under Sections 39.262(h) and (i)"—evidenced legislative intent to ensure an "accurate" stranded-cost figure, as determined by market valuation, and that permitting any adjustments to book value circumvented that statutory goal. Observing that "the relevant statutory goal is not calculating an accurate stranded-cost amount, but calculating an accurate "verifiable, non-mitigable stranded cost[ ]" amount, this Court held that section 39.252(d) "impliedly

9

contemplates some sort of adjustment to book value" because "the Commission is prohibited from adjusting the market value of the generation assets as determined under section 39.262(h) and (i)." *Reliant*, 101 S.W.3d at 148-49.

Thus, *Reliant* merely rejected the broad contention that the Commission lacked *any* statutory power under *any* circumstances to make book value adjustments to correct for what it finds to have been commercially unreasonable conduct. It did not, contrary to the Commission's and Justice Patterson's suggestions, hold that the Commission has statutory authority to make such adjustments under *any* circumstances, much less when the purported commercially unreasonable conduct occurs during a transaction complying with the "bona fide third-party transaction under a competitive offering" standard of PURA 39.262(h)(1). Nor does *CenterPoint* suggest any such thing.

In the portion of *CenterPoint* emphasized by Justice Patterson, the Court addressed whether the Commission had acted arbitrarily and capriciously in refusing to make certain book-value adjustments to reflect alleged commercially unreasonable conduct occurring *before* a stock sale in attempted compliance with the partial-stock valuation method of PURA 39.262(h)(3). In upholding the Commission's ruling, the Court assumed that "[e]ven if [PURA 39.262(d)] allows the Commission to alter the amount that a utility is entitled to recover if the utility fails to 'commercially reasonable ways to reduce its potential stranded costs,' there is no indication from the words used in that section or in any provision of the utilities code that this power is punitive in nature" so as to allow book-value adjustments for conduct having no ultimate impact on the amount

10

of stranded costs. *CenterPoint*, ___ S.W.3d at ___, 2007 Tex. App. LEXIS 9919, at *82-83

(citation omitted). In this regard, the Court explained:

> any power that the Commission may have [under section 39.252(d)] to alter the amount of [stranded-cost] recovery is limited to ensuring that the amount of stranded costs that a utility recovers corresponds to the actual costs that the utility incurred as a result of deregulation and was not intended to be used for punishing utilities for commercially unreasonable behavior. . . . [I]f the commercially unreasonable behavior has no financial impact or if the financial impact is either irrelevant to or accounted for in the valuation method chosen, then adjusting the amount of recovery would be contrary to the legislative directive.

*Id.* at ___, 2007 Tex. App. LEXIS 9919, at *83. Read in its proper context, nothing in this analysis implies that the Commission has statutory power to make book-value adjustments for alleged commercially unreasonable conduct that it deems to impact market price *during* a transaction complying with the legislature's prescribed market valuation methods in PURA 39.262(h).[10] In fact, PURA chapter 39 is to the contrary.

Considering chapter 39 and its stranded-cost recovery scheme as a whole, we conclude that the legislature intended that an electric utility's compliance with the "bona fide third-party transaction under a competitive offering" standard of PURA 39.262(h)(1) in its sale of generation assets satisfies, as a matter of law, any duty during the sale to mitigate its potential stranded costs by commercially reasonable means. We first observe that, as the Commission has acknowledged in this proceeding, the "bona fide third-party transactions under a competitive offering" standard of PURA 39.262(h)(1) is itself a standard of commercial reasonableness. That

---

[10] We note that Justice Puryear, the author of *CenterPoint*, joins this opinion.

11

standard, as noted, serves to ensure that the asset sale yields a valuation that reflects a true market judgment of the generating asset's anticipated revenue streams and other factors bearing on its value in a competitive retail electric marketplace. Conversely, the standard ensures stranded–cost mitigation by preserving the integrity of the market transaction against any incentives that might otherwise exist to depress market value in order to increase stranded-cost recovery. Consequently, the "bona fide third-party transaction under a competitive offering" requirement of PURA 39.262(h)(1) amounts to a particularized application of an electric utility's general duty to mitigate its potential stranded costs through commercially reasonable means. And the fact that the legislature prescribed these specific standards of commercially-reasonable conduct to govern sales of generation assets belies the notion that it impliedly delegated authority to the Commission to enforce some other concept of commercial reasonableness in these transactions. *See Cities of Corpus Christi*, 188 S.W.3d at 691-93 (holding that text of chapter 39 and comprehensiveness of stranded-cost recovery scheme belied legislative intent to impliedly delegate power to Commission to order refunds of stranded-cost "over-recoveries" as calculated under interim estimates before 2004 true-up).

In contending otherwise, the Commission attempts to draw a distinction between the "overall" commercial reasonableness of an asset sale as a determinant of market value, which it acknowledges is addressed by section 39.262(h)(1), and "the commercial reasonableness of a utility's mitigation efforts under PURA § 39.252(d)" during the conduct of the sale, which it deems "a separate issue in this proceeding."[11] What the Commission suggests, in other words, is that

---

[11] Final Order at 15.

PURA chapter 39 imposes a two-tiered duty on electric utilities to mitigate stranded costs through commercially reasonable means during an asset sale under section 39.262(h)(1)—comply with the "bona fide third-party transaction under a competitive offering" standard of section 39.262(h)(1) *and* ensure that it otherwise "perfectly performs all activities relating to a sale" (as later determined by the Commission).[12]  This is not what the legislature has contemplated or required in PURA chapter 39, however.  The legislature has required a legitimate *market* judgment of the generation assets' value—the price yielded through a "bona fide third-party transaction under a competitive offering"—and explicitly prohibited hindsight regulatory judgments of whether the price yielded in such a transaction was "fair," "appropriate," or somehow could have been better.  *See* Tex. Util. Code Ann. §§ 39.252(d), .262(h).

Having determined that TCC's sale of its STP share and the Coleto Creek coal plant meet the *legislature's* prescribed "bona fide third-party transaction under a competitive offering" standard for calculating the assets' market value, we conclude that the Commission had no authority to make book-value adjustments based on its own perceptions as to how or why TCC's conduct during the sale should have achieved better prices than the market actually yielded.  For this reason, we agree with the district court that the Commission's book-value adjustments for purported "commercially unreasonable" conduct during the asset sales amounted to an improper substitution of its judgment for a proper market valuation under PURA 39.262(h)(1).  *See* Tex. Util. Code Ann. § 39.252(d).  Accordingly, we affirm the district court's judgment as to that issue.  Because that

---

[12]  Commission's Reply brief at 11.

disposition obviates the parties' issues regarding the specific amounts of the book-value adjustments, we do not reach them.

**Bridge-power-sales agreements**

This issue concerns the scope of any duty by TCC to mitigate its stranded costs in the interim after it has executed the purchase-sale agreements regarding its generation assets until the transaction finally closed. During this period, TCC continued to sell power generated by the assets. The Joint Appellants insisted that TCC should have executed bridge power-sales agreements with the buyers of the assets. Under the agreements that the Joint Appellants envisioned, the buyers would have compensated TCC with a higher asset sale price in exchange for the right to sell the power generated by the assets until the sales were finalized. They urged that the Commission should reduce the book value of the generation assets by the amount of the margins TCC earned on its power sales during the interim period, thereby reducing its stranded costs. The Commission rejected this argument. We affirm the Commission on this issue.

As previously explained, PURA 39.262(h)(1), governs an electric utility's duty to mitigate potentially stranded costs by commercially reasonable means during its sale of generation assets. When crafting this provision, the legislature was no doubt aware of the complexity of the asset-sale transactions it was contemplating and the likelihood that such sales would not close instantaneously. Importantly, the legislature did not require or regulate a particular treatment of interim power sales, but left those considerations—like myriad others—to be reflected in the market price yielded by the requisite "bona fide third-party transaction under a competitive offering."

14

Alternatively, the Commission did not misinterpret or misapply PURA § 39.252(d). The legislature has required that electric utilities pursue *commercially reasonable* means to reduce their potential stranded costs. *See* Tex. Util. Code Ann. § 39.252(d). TCC presented evidence that bridge power-sales agreements are not common in the industry, and that the effect of such an agreement would be a wealth transfer to the buyer, effectively enabling the buyer to obtain a return on an investment that it ultimately might not ever make. The Commission found that the bridge-power agreements would "increase [the value] artificially," amounted to "an additional asset[] rather than maintenance of the value of the plant itself," and that it was not commercially unreasonable for TCC not to pursue such agreements.[13] We conclude that substantial evidence supports these findings, and that the Commission's interpretation and application of section 39.252(d) to this record is reasonable and consistent with the plain language of the statute.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton
  Joined by Justice Puryear

Filed: June 27, 2008

_____

[13] Final Order at 60-62, 155.